1

2

3

4

5

6                   IN THE UNITED STATES DISTRICT COURT

7                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9      STACEY D. LANGLEY,                    )
                                             )
10                     Petitioner,           )        No C 06-3254 JSW (PR)
                                             )
11            vs.                            )        ORDER DENYING PETITION
                                             )        FOR A WRIT OF HABEAS
12     THOMAS L. CAREY, Warden,              )        CORPUS
                                             )
13                     Respondent.           )
       _____       )
14

15

16

17                              **INTRODUCTION**

18            Petitioner[1], a prisoner of the State of California incarcerated at the

19     California State Prison, Solano, has filed a *pro se* petition for a writ of habeas

20     corpus under 28 U.S.C. § 2254.  This Court ordered Respondent to show cause

21     why a writ should not be issued.  Respondent filed an answer, memorandum and

22     exhibits in support thereof and Petitioner filed a traverse.  For the reasons stated

23     below, the petition is denied on the merits.

24                       **PROCEDURAL BACKGROUND**

25            In March, 2003, a jury convicted petitioner of voluntary manslaughter and

26     being a convicted felon in possession of a firearm.  The jury also found that

27     _____

28            [1]Petitioner is referred to as "Stacey" herein as in the petition, although he
       has submitted documents where he is alternatively referred to as "Stacy."

Petitioner personally used a firearm in the commission of the voluntary manslaughter. Petitioner was sentenced to 11 years in state prison for the manslaughter conviction and a 10 year term, to be served consecutively, for the personal firearm use enhancement. Petitioner was also sentenced to serve a concurrent three year term for being a felon in possession of a firearm. In total, Petitioner was sentenced to 21 years in state prison.

Petitioner appealed to the California Court of Appeal. On March 15, 2005, that court affirmed the judgement. Respondent's Exhibit (hereinafter "Ex.") 4 (Court of Appeal decision). On April 18, 2005, Petitioner filed a petition for review in the California Supreme Court. Ex. 5 (Petition for Review). On June 8, 2005, the Supreme Court denied review "without prejudice to any relief to which [Petitioner] might be entitled after this court determines in *People v. Black*, S126182, and *People v. Towne*, S125677, the effect of *Blakely v. Washington* (2004) ___ U.S. ___ 124 S.Ct. 2531, on California law." Ex. 6 (Denial of Review). On May 17, 2006, Petitioner filed the instant petition.

## FACTUAL BACKGROUND

The facts underlying the charged offenses, as found by the California Court of Appeal are summarized in relevant part, as follows (Petitioner is referred to as "appellant"):

> On March 18, 2000, Valerie Gibson and Charles Hammons hosted a joint 21st birthday party for their son and their nephew at the Holiday Inn on Eighth Street between Mission and Market Streets in San Francisco. A large number of family members and friends were in attendance. There was a DJ providing music, and a "no host" bar at which party goers could purchase drinks.
>
> Appellant and his codefendant, Terrance Henderson, arrived together at the party sometime between 11 p.m. and midnight. Appellant was wearing a backward baseball cap, a T-shirt, and very baggy pants that sagged low at his waist so his underwear was visible. They went out on the dance floor, and appellant began "acting up," allowing his pants to drop below

his knees.

Twice while she was dancing, Candace Primus, a cousin of the party honorees, felt someone's hand on her buttock. Each time, she turned to see that it had been appellant's codefendant, Henderson, and she asked him not to touch her. Henderson only smiled in response. After the second time, Primus felt something bump against her from behind. She turned, and saw appellant with his pants down to his knees, and with his pubic hair visible. Primus told appellant "That is not cute to me at all." Appellant simply smiled and pulled his pants up slowly. Later, while she was dancing again, Primus felt someone's hand touching her vaginal area through her pants. She turned and saw Henderson. She held her hand to his chest, pushed him away from her, looked him in the eyes, and said: "Please stop touching me. Why won't you stop touching me?" Henderson just smiled at her. Feeling afraid and intimidated by appellant and Henderson, Primus went to tell her brother Tyrone and her aunt what they had been doing to her, and that she was afraid something was going to happen to her.

Primus and her brother witnessed both appellant and Henderson touching and behaving inappropriately with other women at the party. When he saw them doing the same thing to his own girlfriend while he was dancing with her, Tyrone Primus told them: "[w]hy don't you all stop touching on my girl. Stop touching on my sister, you know. This is a family event. We [are] trying to party here. Why don't you all be cool."

Shortly after appellant and Henderson left the party and walked out into the lobby, Candace and Tyrone Primus went out after them. Once outside the ballroom, Tyrone approached appellant and Henderson. He accused them of "touching on" his sister and "everybody" at the party with "disrespect." Both appellant and Henderson started swearing at Tyrone, saying "Fuck your sister.... Fuck your girl. Fuck the party." Tyrone then asked why they could not "respect" the fact they were "just having a family event." Appellant responded that Tyrone should have approached them "more like a man." Ronondo Cooper, a cousin of both Tyrone Primus and victim Tyrie McClellan, told appellant and Henderson the party was over and asked "why don't [you] go ahead and leave," but they did not do so. As the situation became more tense, a "crowd" of party guests and family members gathered around; there was a lot of noise, and some "pushing." Candace and Tyrone Primus went back into the ballroom, preparing to leave. Gibson approached appellant and Henderson, told them she was hosting the party for her son and nephew, announced that the party was over, and asked them to "please leave." Neither appellant nor Henderson responded to her. Gibson then went back into the ballroom.

After getting their coats, Candace and Tyrone Primus started to leave the party. As they did so, they passed appellant and Henderson. Appellant said: "You all want to end this. This is not over with." Candace and Tyrone ignored them, and walked out to the front of the building. A hotel

representative approached the crowd inside, and it began to disperse and leave the party. Appellant and Henderson also left.

While a group of partygoers was gathered outside the hotel, appellant drove up and got out of the driver's side of a car as Henderson got out of the passenger's side. As appellant walked around the car, his shirt opened revealing a gun tucked into his pants waistband on his right side. Several people said "Stay back. They['ve] got a gun." Appellant approached Candace and Tyrone Primus and said "What's up?" When Tyrone responded in kind, appellant said: "You all said you wanted to end it now. Let's end it." After Tyrone responded by saying that it was "over with," "we don't want no problems with you all," and "[w]hy don't you all just leave," appellant repeated "It ain't over," "I'm about to end this," "Let's finish it," or words to that effect.[2]  Candace said, "Well, maybe we all had a little bit too much to drink or something out here." Henderson replied, "No, ain't nobody drunk out here. Don't blame it on no drinks."[3] Appellant then said, apparently speaking to people standing behind Tyrone, "[y]ou all better get from behind him. You all know what I am about to do."

Tyrie McClellan, a family member and guest at the party, was standing on the street "a little distance" away from appellant and Henderson. McClellan approached appellant extending his hand, as though to shake hands, and said: "Man, it's cool. Ain't nobody tripping." Appellant said "Man, don't be coming on the side of me. I don't know you," "Nigger, what you trying to sneak up on the side of me," and "Get the fuck away from me," or words to that effect. Appellant pulled out a gun from his waist, raised and extended his arm, took aim, and fired a shot. Someone yelled, "He's got a gun," and people started to run. McClellan, who had also started to run away, fell to the ground about 15 feet away from appellant. Without apparently changing his aim, appellant fired a second shot. Appellant attempted to continue firing, but the gun appeared to jam. The gun appeared to be a nine millimeter semiautomatic weapon. After appellant attempted to clear the chamber for a moment, he got in the car with Henderson and drove off.

---

[2]Five different witnesses all testified to appellant's words to Tyrone Primus outside the hotel. Although their versions of what appellant said varied somewhat, all five included some element of "ending" or "finishing it," or bringing "it" to a conclusion.

[3]Although Candace Primus replied affirmatively when asked if she had seen appellant exhibit any behavior she would consider that of "someone drunk," the only behavior she cited for that opinion was appellant's "[s]miling when [she] asked him not to touch [her]" on the dance floor. On the other hand, she also testified that she did not see appellant drink any alcohol at the party; when he confronted her brother outside the hotel, she could not recall his words being slurred; she did not smell alcohol on his person; and he did not appear to stagger, sweat, or have bloodshot eyes.

4

McClellan suffered two gunshot wounds. One bullet traveled completely through his left thigh and lodged in his right thigh, fracturing a bone. The second bullet entered his left temporal forehead region, with fragments exiting his body and other fragments lodged in his brain. As a result of his wounds, McClellan never regained the ability to speak, breathe unassisted, take care of himself or answer questions, and he was never fully alert. He remained in a persistent vegetative state for over 10 months, until he expired on January 28, 2001. At trial, the San Francisco Chief Medical Examiner testified that McClellan never recovered from the consequences of his gunshot wounds, and on that basis opined that there was no break in the chain of proximate cause between the shooting and his death. Appellant was arrested in Dallas, Texas, on July 6, 2000.

Appellant testified in his own defense. He had previously been shot on September 25, 1999, in his back and elbow, resulting in serious injuries requiring a "[c]ouple of weeks" of hospitalization, several surgeries, the implanting of "screws and pins" in his elbow, reconstruction of his intestines, and the removal of one kidney and his gallbladder. Since being shot, he suffered from paranoia, nightmares, and depression, felt suicidal, and was afraid of loud noises.

In the afternoon on March 18, 2000, appellant attended a neighborhood barbecue, at which he began drinking heavily around 2 p .m. and continued doing so to between 5 and 6 p.m. During the day, Curtis Holden invited appellant to the party that night to be held at the Holiday Inn, at which Holden was one of the birthday honorees. Appellant testified that he continued to drink heavily before he left for the party around 11 p.m. with his friend Henderson. Appellant took a gun to the party, because he felt he needed one "for [his] protection." He had the gun in the pocket of his leather jacket. Once they arrived, appellant asked the DJ to hold his jacket for him. Appellant then drank some more alcohol. He was also feeling the effects of the alcohol he had been drinking earlier that day. Appellant felt like "having fun and dancing." Appellant testified that he saw Candace Primus on the dance floor, and "decided to walk up to her and dance with her." While he was dancing with her, he let his pants fall down to his mid thigh level, because he was "just having fun, being silly." When Candace told him "it wasn't cute," he "immediately pulled [his] pants up." Appellant denied ever touching Candace, and denied seeing Henderson do so. He testified that he walked off the dance floor and had "[o]ne or two more" alcoholic drinks.

Feeling like he "needed to get some air," appellant walked off the dance floor and into the hallway with Henderson. In the hallway, several people from the party, including Candace and Tyrone Primus, approached them. According to appellant, Tyrone walked "up into [Henderson's] face" and said: "What the fuck you doing touching on my sister?" An argument ensued, and other people came out of the ballroom and gathered around, aggressively "coming up in [their] face, [and] backing [them] up." Appellant felt "scared" and "angry," and afraid someone had a gun.

5

Appellant and Henderson left the hotel. As they were driving away from the garage, appellant remembered that he had left his jacket at the party with the gun in it. Appellant had Henderson pull the car over in front of the hotel so he could retrieve his jacket. Appellant denied having his gun at the time, or intending to shoot anyone. When appellant got out of the car, Tyrone Primus saw him and said: "Nigger, you back. Nigger, what's up?" Appellant testified that he backed up and said: " 'Man, I'm not trying to disrespect nobody out here.' or, 'I respect my elders.' " Tyrone continued to confront him, saying: "Nigger, I end this shit. Nigger, I end this." Appellant thought people were trying to surround him, and felt afraid. He backed up, saying: "I ain't got no problems. I ain't trying to disrespect out here." Hearing someone mention a gun, appellant thought Tyrone or someone else had a concealed weapon. While this confrontation was taking place, someone came out and told appellant that the DJ had his jacket. Appellant, who was in the street, asked the man to bring it out to him, because in that "hostile" atmosphere, he did not want to have to walk through the crowd to get back into the hotel. The man went back inside, retrieved appellant's coat, and brought it out to him.

After appellant got his jacket, he put it on slowly, simultaneously trying to watch all the people around him. At that moment, he saw someone "running out of nowhere with his shirt off," and also noticed McClellan coming up to him "behind" him, sliding step by step in a sideways fashion, with his hand held out. Appellant stopped him and said: "Nigger, what the fuck you trying to creep up on me?" Appellant felt "scared," "paranoid" and "vulnerable." He reached into his coat pocket, pulled out the gun, and pointed it toward the person who was closest to him, because that was the one who "could get to [him] faster." Appellant fired the gun as he turned and ran back to the car. Appellant could only remember firing the gun once, although he acknowledged he could have fired twice. The next morning, he learned that someone had been shot in the head. Afraid that he would go to prison, appellant destroyed the gun and fled to Dallas, where he was ultimately arrested.

Gregory Merrill, a licensed clinical social worker in the psychiatry department of San Francisco General Hospital, counseled individuals suffering from severe traumatic injury caused by violence. Based on his meetings with and counseling of appellant after the latter was shot and seriously injured in September 1999, Merrill diagnosed appellant as suffering from acute post-traumatic stress disorder. Merrill testified that persons suffering from that disorder, particularly as a result of having been shot, were "very, very sensitive to danger; they feel constantly in danger, they perceive danger everywhere," and sometimes "arm themselves" with a gun as a result. Merrill counseled appellant that, due to his mental disorder, he posed a danger to himself and others by carrying a firearm.

Based on the bullet fragments removed from the victim, a ballistics expert testified that the bullet that struck his head ricocheted off a very hard surface, such as the sidewalk or pavement, before hitting him. He also

6

1    opined that at the time he received the head wound, the victim's head was
2    close to the ground, and about three inches away from the point from
     which the bullet ricocheted.

3    *People v. Langley,* 2005 WL 591256 at *1-5 (Cal.App. 1 Dist. 2005); Ex. 4

4    (Court of Appeal decision) at 2-8.

5                           **STANDARD OF REVIEW**

6            This Court may entertain a petition for a writ of habeas corpus "in behalf

7    of a person in custody pursuant to the judgment of a state court only on the

8    ground that he is in custody in violation of the Constitution or laws or treaties of

9    the United States."  28 U.S.C. § 2254(a).  A district court may grant a petition

10   challenging a state conviction or sentence on the basis of a claim that was

11   "adjudicated on the merits" in state court only if the state court's adjudication of

12   the claim: "(1) resulted in a decision that was contrary to, or involved an

13   unreasonable application of, clearly established Federal law, as determined by the

14   Supreme Court of the United States; or (2) resulted in a decision that was based

15   on an unreasonable determination of the facts in light of the evidence presented

16   in the State court proceeding."  28 U.S.C. § 2254(d).

17           Under the 'contrary to' clause, a federal habeas court may grant the writ if

18   a state court arrives at a conclusion opposite to that reached by the Supreme

19   Court on a question of law or if the state court decides a case differently than the

20   Supreme Court has on a set of materially indistinguishable facts.  *Williams v.*

21   *Taylor*, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application'

22   clause, a federal habeas court may grant the writ if a state court identifies the

23   correct governing legal principle from the Supreme Court's decisions but

24   unreasonably applies that principle to the facts of the prisoner's case."  *Williams*,

25   529 U.S. at 413.  As summarized by the Ninth Circuit: "A state court's decision

26

27                                          7

28

can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000) *overruled on other grounds*; *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003) (citing *Williams*, 529 U.S. at 405-07).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must not only be erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

In deciding whether a state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of the Petitioner's claim in a reasoned decision.  *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the state court decision.  *Williams* 529 U.S. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  While the circuit law may be "persuasive authority" for the

purposes of determining whether a state court decision is an unreasonable

application of Supreme Court precedent, only the Supreme Court's holdings are

binding on the state courts and only those holdings need be "reasonably" applied.

*Id.*

     If the state court decision only considered state law, the federal court must

ask whether state law, as explained by the state court, is "contrary to" clearly

established governing federal law.  *See Lockhart v. Terhune*, 250 F.3d 1223,

1230  (9th Cir. 2001); *see, e.g., Hernandez v. Small*, 282 F.3d 1132, 1141 (9th

Cir. 2002) (state court applied correct controlling authority when it relied on state

court case that quoted Supreme Court for proposition squarely in accord with

controlling authority).  If the state court, relying on state law, correctly identified

the governing federal legal rules, the federal court must ask whether the state

court applied them unreasonably to the facts.  *See Lockhart*, 250 F.3d at 1232.

## DISCUSSION

     In his petition for a writ of habeas corpus, Petitioner asserts two claims for

relief: (1) the trial court violated Petitioner's due process rights by incorrectly

instructing the jury regarding voluntary intoxication; and (2) Petitioner's sentence

violated Petitioner's rights under *Blakely v. Washington*, 542 U.S. 296 (2004).

**A.**     **Jury Instruction Claim**

     Petitioner was charged with a specific intent crime (murder) and a

general intent crime (possession of a firearm as a felon).  The trial court properly

instructed the jury with the legal definitions of those crimes and the lesser-

included offenses, including their applicable mental states, Exhibit 1 (Clerk's

Transcript, hereinafter "CT") at 182-188 and 205, as well as the pattern jury

instruction regarding the required concurrence of act and specific intent with

regard to the homicide, CT 166-67.  However, when instructing the jury with regard to the law regarding voluntary intoxication, the trial judge provided a version of the applicable jury instruction, CALJIC No. 4.21.1, that misstated the law.  The instruction, with the problematic section italicized, reads as follows:

> It is the general rule that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition.
>
> *Thus, in the crime of Murder in the First Degree charged in Count 1 or the crimes of Murder in the Second Degree and Voluntary Manslaughter, which are lesser thereto, the fact that the defendant was voluntarily intoxicated is not a defense and does not relieve defendant of responsibility for the crime. This rule applies in this case only to the crime of Murder in the First Degree, and the lesser crimes of Murder in the Second Degree and Voluntary Manslaughter.*
>
> However, there is an exception to this general rule, namely, where a specific intent or mental state is an essential element of a crime. In that event, you should consider the defendant's voluntary intoxication in deciding whether the defendant possessed the required specific intent or mental state at the time of the commission of the alleged crime.
>
> Thus, in the crime of Murder in the First Degree, charged in Count 1, or the lesser crimes of Murders in the Second Degree and Voluntary Manslaughter a necessary element is the existence in the mind of the defendant of a certain specific intent or mental state which is included in the definition of the crimes set forth elsewhere in these instructions.
>
> If the evidence shows that a defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether or not the defendant had the required specific intent or mental state.
>
> If from all the evidence you have a reasonable doubt whether a defendant had the required specific intent or mental state, you must find that defendant did not have that specific intent or mental state.

CT at 168-69 (emphasis added).

Petitioner argues that the trial court's use of the italicized portion of the above instruction constituted federal constitutional error because it incorrectly instructed the jury that voluntary intoxication was not a defense to voluntary

manslaughter.[4]

### 1. Legal Standard

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72 & n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990); *see, e.g., Ficklin v. Hatcher*, 177 F.3d 1147, 1150-51 (9th Cir. 1999) (harmless error when certain that jury did not rely on constitutionally infirm instruction).

A determination that there is a reasonable likelihood that the jury has

---

[4] At the time of the homicide in this case, the crime of voluntary manslaughter included as a necessary element the specific intent to kill. *People v. Blakeley,* (2000) 23 Cal.4th 82, 87-93; CALJIC No. 8.40; Cal. Pen. Code, § 192, subd. (a).

applied the challenged instruction in a way that violates the Constitution

establishes only that an error has occurred, however. *See Calderon v. Coleman*,

525 U.S. 141, 146 (1998). If an error is found, the court also must determine that

the error had a substantial and injurious effect or influence in determining the

jury's verdict, *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), before

granting relief in habeas proceedings. *See Calderon*, 525 U.S. at 146-47; *see,*

*e.g., Sarausad v. Porter*, 479 F.3d 671, 679 (9th Cir. 2007) (finding reasonable

likelihood that jury applied ambiguous instruction on accomplice liability to find

defendant guilty of murder in a way that relieved the State of its burden of proof,

and that this error was not harmless).

### 2. Analysis

The Court of Appeal found that CALJIC No. 4.21.1 was "appropriate"

for Petitioner's case, but the instruction was incorrect in that:

> [T]he trial court mistakenly inserted the count one charge of first degree
> murder, with its lesser included offenses of second degree murder and
> voluntary manslaughter, in *both* the general and specific intent portions
> of the instruction, when it should have inserted the general intent crime
> charged in count two-unlawful possession of a firearm by an ex-felon-in
> the portion of the instruction dealing with general intent crimes.

Exhibit 4 (Court of Appeal decision) at 12 n.4 (italics in original).

The Court of Appeal found the instruction "confusing," "contradictory"

and ultimately "incorrect." Exhibit 4 (Court of Appeal decision) at 11-12.

Because the erroneous instruction went to a key legal issue regarding the

elements of the offense, the court analyzed whether the error was harmless

beyond a reasonable doubt under the federal standard presented in *Chapman v.*

*California*, 386 U.S. 18, 24 (1967). Exhibit 4 (Court of Appeal decision) at 13.

After analyzing the error in the "context of the other instructions given and the

trial record as a whole," the court found that "the jury was thoroughly informed

12

on the proper treatment of voluntary intoxication in their deliberations," the "evidence supporting [Petitioner's] intent to kill was overwhelming" and "the evidences does *not* support a conviction of involuntary manslaughter based on voluntary intoxication." Exhibit 4 (Court of Appeal decision) at 14-15 (emphasis in original). The Court of Appeal concluded that the error was harmless and that there was "no reasonable doubt that the jury would have convicted [Petitioner] of voluntary manslaughter in the absence of the error." Exhibit 4 (Court of Appeal decision) at 16.

Ordinarily this Court must consider whether "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution" before finding that an erroneous jury instruction rises to the level of constitutional error. *Estelle*, 502 U.S. at 72 (quoting *Boyde*, 494 U.S. at 380). This Court is "not required to use the 'reasonable likelihood' standard employed for ambiguous jury instructions 'when the disputed instruction is erroneous on its face.'" *Ho v. Carey*, 332 F.3d 587, 592 (9th Cir. 2003) (quoting *Wade*, 29 F.3d at 1321) (holding that "[t]he [trial] court's erroneous instruction that general intent is an element of murder in the second degree based on implied malice . . . was constitutional error"). In *Ho*, the Ninth Circuit found that omitting the element of specific intent from a crime with that mental state gives rise to federal constitutional error. *Ho*, 332 F.3d at 593.

However, in this case, the jury instruction was ambiguous in that it instructed the jury to consider both that voluntary intoxication was not a defense to the homicide and that it was. This instruction must not be considered in isolation, but rather in the "context of the overall charge." *U.S. v. Harrison*, 34 F.3d 886, 889 (1994). In *Boyde*, the Supreme Court noted that when evaluating

13

the reasonable likelihood standard, jurors "do not sit in solitary isolation booths parsing instructions" but instead consider them "with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting."  394 U.S. at 380-81.

In light of the overall charge, which repeatedly stressed that the murder charges, including voluntary manslaughter, required a finding of a specific intent to kill, *see* CALJIC 3.31, CT at 166; CALJIC 8.40, CT at 182, and the erroneous instruction also correctly instructed the jury "you should consider the defendant's voluntary intoxication in deciding whether the defendant possessed the required specific intent or mental state at the time of the commission of the alleged crime," this Court finds there is not a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution.  This Court finds that erroneously instructing the jury that voluntary intoxication was both a defense, and not a defense, to voluntary manslaughter in light of the overall charge did not rise to the level of federal constitutional error and that the Court of Appeal's ruling has not "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The Court of Appeal applied the federal harmless error standard set forth in *Chapman v. California*, 386 U.S. 18, 24 (1967).  The court also considered Petitioner's claim "in the context of the instructions as a whole and the trial record."  *Estelle*, 502 U.S. at 72. In finding the erroneous instruction harmless, the Court of Appeal cited three reasons for its decision.  First, the court found that "the jury was thoroughly informed on the proper treatment of voluntary intoxication in their deliberations, despite any confusion arising from the trial court's instruction." Exhibit 4 (Court of Appeal decision) at 14.  The Court of

14

Appeal based its reasoning on the many other correct instructions given to the jury. *Id*. The trial court correctly instructed the jury on specific intent[5] and the elements of voluntary manslaughter[6]. These two instructions in combination clearly explained to the jury that an intent to kill was necessary to convict Petitioner of voluntary manslaughter. Petitioner's counsel described voluntary intoxication as negating any intent to kill during his closing arguments. Exhibit 2R (Reporter's Transcript, hereinafter "RT") at 2110, 2112. The prosecutor also clearly and accurately explained the law in his closing argument by telling the jury to "consider [voluntary intoxication] only to consider whether or not [Petitioner] could have develop[ed] the intent and the mental state for the commission of these crimes." RT at 2173. Finally, the Court of Appeal recognized that the only questions posed by the jury were clarifications of "intent to kill" and "specific intent" as they related to voluntary manslaughter, and that "there were *no* questions posed from the jury indicating any confusion about the effect of [Petitioner's] alleged voluntary intoxication." Exhibit 4 at 15. The court's opinion that the jury had a correct understanding of the law, that the error was harmless under *Chapman,* was a reasonable conclusion for it to draw from the record.

The Court of Appeal's second reason for denying Petitioner's claim was

---

[5]Regarding specific intent, the jury was instructed that "[i]n the [crime of] Voluntary Manslaughter . . . there must exist a . . . specific intent in the mind of the perpetrator." Exhibit 1 (Jury Instructions) at 166.

[6]The jury was instructed that "[i]n order to prove [Voluntary Manslaughter], each of the following elements must be proved:
1. A human being was killed;
2. The killing was unlawful; and
3. The killing was done with the intent to kill;" Exhibit 1 (Jury Instructions) at 188.

that "[t]he evidence supporting [Petitioner's] intent to kill was overwhelming." Exhibit 4 at 14.  This Court finds that the appellate court was reasonable in reaching that conclusion.  Multiple witnesses testified to Petitioner's statements regarding his intent to "end it right now," RT at 135, "finish it," RT at 399, "end it," RT at 491, or "end it now," RT at 932.  Even more revealing of Petitioner's intent was his warning to the party-goers to "get from behind" Tyrone Primus because the crowd knew "what [Petitioner] was about to do."  RT at 934.  Based on Petitioner's words and actions, Tyrone Primus also felt that Petitioner was "fixin [sic] to try to shoot [him]."  *Id.*  In killing the victim, Petitioner fired, not once, but twice, with the second shot hitting the victim in the head from about 15 feet away.  RT at 1078-79.  Even if this shot ricocheted inches from the victim's head, as one expert suggested at trial, RT at 1341, the act of drawing a weapon and deliberately shooting from 15 feet away at a person lying on the ground, accurately enough to kill, demonstrates Petitioner's intent to kill.  There was also evidence that Petitioner would have continued to fire had his gun not jammed. RT at 495-97.  The Court of Appeal was reasonable in finding overwhelming evidence of Petitioner's intent to kill.

The Court of Appeal's final reason for finding the instructional error harmless was that the "evidence [did] *not* support a conviction of involuntary manslaughter based on voluntary intoxication."  Exhibit 4 at 15 (emphasis in original).  This Court finds the Court of Appeal's determination of this issue to be reasonable.  Under California law, voluntary intoxication is not a defense to homicide, but "[w]hen a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter." *People v. Ochoa*, 19 Cal.4th 353, 423-24 (1998).  There is no

evidence that Petitioner was "unconscious" at the time of the homicide in question.  In fact, Petitioner describes the moments leading up to the shooting quite clearly:

> As I get the jacket, I am studying, trying to watch.  I pull one arm in.  I am going slow.  I am putting one arm in.  I am trying to watch these people.  Then I am trying to put this arm in.  I don't want them to catch me out of a vulnerable moment as I am putting the coat on.  So I slide the coat on.  At that moment, I see this guy running out of nowhere with his shirt off, and I seen at that time they really started coming in closer . . . At that point, I reached in my coat pocket.  And as I was - - as I reached into my coat pocket, I pulled the gun out.  And as I am pointing it, there was motion.  I never actually pointed at no one in particular, but towards - - to the person that was closest to me and felt that could get to me faster.  And I fired as I was turning and running.

RT at 1720-21.

Nobody testified about Petitioner exhibiting any of the normal signs of intoxication, such as smelling of alcohol, slurring of words, or staggering when walking.  Just before the shooting, Petitioner's co-defendant, Henderson, stated that "ain't nobody drunk out here," and warned not to "blame [the confrontation] on no drinks."[7]  RT at 153.  Finally, the jury did not seem confused about the voluntary intoxication issue, as the Court of Appeal noted that "there were *no* questions posed from the jury indicating any confusion about the effect of [Petitioner's] alleged voluntary intoxication."  Exhibit 4 at 15 (emphasis in original).  The Court of Appeal's analysis was reasonable.

Even if this Court were to find a due process violation from this instructional error, that is not the end of the analysis.  "Habeas petitioners are not entitled to relief unless they can establish that the error resulted in 'actual prejudice,' because it had a 'substantial and injurious effect or influence in

---

[7]In the factual background section of its opinion, the Court of Appeal correctly attributed these statements to Henderson, but then incorrectly attributed them to Petitioner in the analysis portion of its opinion. Notwithstanding this mistake, the court's reasoning remains sound.

1    determining the jury's verdict.'" *Ho*, 332 F.3d at 595 (internal citations omitted)

2    (quoting *United States v. Lane*, 474 U.S. 438, 449, (1986) and *Brecht*, 507 U.S. at

3    637).  The instructional error in this case did not result in "actual prejudice."  As

4    discussed above there was ample evidence of Petitioner's intent to kill, and little

5    evidence that Petitioner was rendered unconscious through voluntary

6    intoxication.  Furthermore, the jury received proper instructions from the trial

7    court regarding specific intent and voluntary manslaughter, and correct

8    arguments regarding the legal consequences of voluntary intoxication from both

9    the prosecutor and Petitioner's counsel.  Based on the foregoing, no reasonable

10   jury could have found that Petitioner was intoxicated to the point of

11   unconsciousness and did not have the intent to kill.  This Court finds the error

12   was harmless under *Brecht* and no habeas relief is available on this claim.

13   **B.**      ***Blakely/Cunningham* Error**

14           At Petitioner's sentencing hearing, the trial judge imposed the upper term

15   of 11 years on the voluntary manslaughter conviction.  The court based the upper

16   term on the following aggravating factors: (1) Petitioner's lengthy criminal

17   record;[8] (2) his recent prior convictions involving guns and violence; (3) his prior

18   poor performance on probation; (4) the fact that he was on probation for being an

19   ex-felon in possession of a gun with a no-weapons condition at the time of his

20   offense; and (5) his violent conduct, which indicated he was a danger to society.

21   The trial court explicitly rejected the proposed aggravating factor for weapon use

22   in the commission of a the crime since that would constitute dual use when

23   combined with the personal firearm use conviction.  *See,* California Rules of

24   Court 4.421(b).  Finally, the court found that the aggravating factors outweighed

25   ──────────────

26           [8]California Rules of Court, Rule 4.421(b)(2) lists that fact that "[t]he defendant's
     prior convictions as an adult or sustained petitions in juvenile delinquency proceedings
27   are numerous or of increasing seriousness" as an aggravating factor.

28                                              18

Petitioner's sole mitigating factor: his fragile mental state.  RT at 304-15; Cal. Rules of Court 4.421.

The trial judge also imposed the upper term of 10 years on Petitioner's personal use of a firearm enhancement based on three aggravating factors: (1) the number and increasing severity of Petitioner's prior convictions; (2) his probationary status at the time of his offense; and (3) his unsatisfactory performance on probation.  The court found no mitigating factors.  RT at 315-16.

Petitioner argues that the trial court's imposition of the upper terms on his convictions based on facts not found by the jury violated his right to a jury trial under *Blakely*, 542 U.S. 296.

### 1. Legal Standard

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to a trial by jury.  U.S. Const. amend. VI.  This right to a jury trial has been made applicable to state criminal proceedings via the Fourteenth Amendment's Due Process Clause.  *Duncan v. Louisiana*, 391 U.S. 145, 149-50 (1968).  The Supreme Court's Sixth Amendment jurisprudence was significantly expanded by *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and its progeny, which extended a defendant's right to trial by jury to the fact finding used to make enhanced sentencing determinations as well as the actual elements of the crime.  "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Id.* at 488-90 (2000).  The "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge could impose based solely on the facts reflected in the jury verdict or admitted by the defendant; that is, the relevant "statutory maximum" is not the sentence the judge could impose after finding additional facts, but rather is the maximum he or she could impose without any additional findings.  *Blakely*, 542 U.S. at 303-04.

1    In *Cunningham v. California*, 549 U.S. 270 (2007), the Court held that

2    California's determinate sentencing law ("DSL") violated the Sixth Amendment

3    because it allowed the sentencing court to impose an elevated sentence based on

4    aggravating facts that it found to exist by a preponderance of the evidence. *Id.* at

5    274, 291-92.  The sentencing court was directed under the DSL to start with a

6    "middle term" and then move to an "upper term" only if it found aggravating

7    factual circumstances beyond the elements of the charged offense. *Id.* at 278.

8    Concluding that the middle term was the relevant statutory maximum, and noting

9    that aggravating facts were found by a judge and not the jury, the Supreme Court

10   held that the California sentencing law violated the rule set out in *Apprendi*.

11   *Id.* at 293-94.  Although the DSL gave judges broad discretion to identify

12   aggravating factors, this discretion did not make the upper term the statutory

13   maximum because the jury verdict alone did not authorize the sentence and

14   judges did not have the discretion to choose the upper term unless it was justified

15   by additional facts. *Id.* at 288-89.

16       *Apprendi*'s "prior conviction" exception is limited to prior convictions

17   resulting from proceedings that afforded the procedural necessities of a jury trial

18   and proof beyond a reasonable doubt.  *United States v. Tighe*, 266 F.3d 1187,

19   1194 (9th Cir. 2001).  Recidivism and prior convictions increasing the maximum

20   penalty need not be charged to comport with the constitutional right to fair notice

21   because they are not considered an element of the offense charged. *See*

22   *Almendarez-Torres v. United States*, 523 U.S. 224, 243-44 (1998); *United States*

23   *v. Pacheco-Zepeda*, 234 F.3d 411, 414-15 (9th Cir. 2001), *cert. denied*, 532 U.S.

24   966 (2001) (holding that *Almendarez-Torres* remains good law after *Apprendi*

25   and provides that prior convictions, whether or not admitted by the defendant on

26   the record, are sentencing factors rather than elements of the crime).

27       Prior convictions resulting from adjudications that do not afford the right

28   20

to a jury trial and a beyond-a-reasonable-doubt burden of proof do not fall within *Apprendi*'s "prior conviction" exception; therefore, they must be submitted to a jury and proved beyond a reasonable doubt before they can be used to increase the penalty for a crime beyond the prescribed statutory maximum. *See Tighe,* 266 F..3d at 1194-95 (juvenile adjudications that do not afford the right to a jury trial and beyond-a-reasonable-doubt burden of proof do not fall within *Apprendi*'s "prior conviction" exception). *Tighe*'s holding does not represent clearly established Supreme Court precedent, however. *See Boyd v. Newland*, 467 F.3d 1139, 1152 (9th Cir. 2006) (in the face of other-circuit authority that is directly contrary to *Tighe*, and in the absence of explicit direction from the Supreme Court, it cannot be said that California courts' use of a juvenile adjudication as a sentencing enhancement was contrary to, or involved an unreasonable application of, Supreme Court precedent).

The Ninth Circuit has previously found that a sentencing court's determination that the current offense was committed while the defendant was on probation does not come within *Apprendi*'s "prior offense" exception. *Butler v. Curry*, 528 F.3d 624, 641 (9th Cir. 2008). However, the Ninth Circuit recently elaborated on that holding, stating that "*Butler* does not represent clearly established law 'as determined by the Supreme Court of the United States.' 28 U.S.C. § 2254(d)(1)." *Kessee v. Mendoza-Powers*, 574 F.3d 675, 679 (9th Cir. 2009) (holding that the state appellate court's finding that Petitioner had committed crimes while on probation fell within the "prior conviction" exception does not contravene AEDPA standards.) As *Kessee* states,

> Because the Supreme Court has not given explicit direction and because the state court's interpretation is consistent with many other state courts' interpretations, we cannot hold that the state court's interpretation was contrary to, or an unreasonable application of established Supreme Court precedent.

**2.  Analysis**

The Court of Appeal began its analysis of Petitioner's sentencing claims by addressing the court's reliance on Petitioner's prior convictions as an aggravating factor, recognizing that "*Blakely* does not require the fact of a defendant's prior convictions to be found by a jury."  Exhibit 4 at 17.  The court further found that Petitioner's "status as a probationer at the time of this offense having arisen directly from the fact of his prior conviction, . . . is a recidivism-related factor essentially analogous to a prior conviction and did not require being tried to and found by a jury beyond a reasonable doubt."  Exhibit 4 at 17-18.  With regard to the other two aggravating factors found by the trial judge, poor performance on probation and danger to society, the court found that even if they were error, the error was harmless.  Exhibit 4 at 18.  The Court of Appeal held that "the trial court could have legitimately imposed the aggravated term on appellant's voluntary manslaughter conviction based on the aggravating factor of appellant's prior criminal history, [and base] the aggravated term on the firearm use enhancement on his status as a probationer."  Exhibit 4 at 18.  The court concluded its analysis by stating that it was "certain [the trial court] would have imposed the same aggravated term" even if "it had known it was improper for it to rely on the aggravating factors of [Petitioner's] probationary performance and his danger to society."  Exhibit 4 at 18.

In light of the Ninth Circuit's recent decision in *Kessee,* this Court finds that the Court of Appeal's finding that Petitioner's probationary status at the time of the offense fell under *Apprendi's* "prior conviction" exception was not contrary to or an unreasonable interpretation of established Supreme Court precedent.  *Kessee,* 574 F.3d at 679.  The *Kessee* court noted that while the sentencing court's finding that a convict was on probation at the time of the crime does not come within the "prior conviction" exception to the *Apprendi* rule, a

1    state court's finding to the contrary does not contravene AEDPA standards.  *Id.* at

2    678.

3             This Court finds that because the Supreme Court has not specifically

4    addressed whether a finding that a petitioner was on probation or parole falls

5    within *Apprendi*'s "prior conviction" exception, a state court's finding that a

6    judge sentencing a convict to an enhanced term based on that fact does not

7    violate the Sixth Amendment is not contrary to, or an unreasonable interpretation

8    of, established Supreme Court precedent.  *See Kessee,* 574 F.3d at 678.

9    Moreover, the Court of Appeal properly found that a sentencing court's reliance

10   on a convict's prior criminal convictions falls within *Apprendi*'s "prior

11   conviction" exception and does not constitute a claim for relief.  Since the

12   "finding of a single aggravating factor is sufficient to render a defendant eligible

13   for the upper term" this Court need not address the sentencing court's reliance on

14   factors other than Petitioner's prior criminal convictions and probationary status

15   in imposing the upper term on each conviction.  *See Butler*, 528 F.3d at 632.

16            However, if this Court had found that the state courts' imposition of the

17   upper term based on these factors were contrary, or an unreasonable

18   interpretation of, *Blakely*, *Apprendi* and *Cunningham*, the error would be subject

19   to review for harmlessness as set forth in *Brecht v. Abrahamson*, 507 U.S. 619

20   (1993).  Failure to submit a sentencing factor to the jury, like failure to submit an

21   element to the jury, is not structural error; therefore, it is subject to harmless-error

22   analysis.  *Washington v. Recuenco*, 548 U.S. 212, 221-22 (2006).

23            In conducting the harmless error analysis, this Court must grant

24   Petitioner habeas relief if there is "'grave doubt' as to whether a jury would have

25   found the relevant aggravating factors beyond a reasonable doubt."  *Butler*, 528

26   F.3d at 648 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).  It is

27   established that "[g]rave doubt exists when, 'in the judge's mind, the matter is so

28

1    evenly balanced that he feels himself in virtual equipoise as to the harmlessness

2    of the error.'" *Id*. at 648 (quoting *O'Neal*, 513 U.S. at 435).  Finally, this court

3    cannot "consider new admissions made at sentencing in [a] harmless error

4    inquiry" but evidence presented at the sentencing proceeding can be considered

5    "insofar as [it] would help . . . adduce what other evidence might have been

6    produced at trial, had the question been properly put before the jury." *United*

7    *States v. Salazar-Lopez*, 506 F.3d 748, 755 (9th Cir.2007).

8            Under the prior conviction exception to *Apprendi*, the trial judge in

9    Petitioner's case properly relied on Petitioner's prior convictions as an

10    aggravating factor without those convictions being proven to the jury.  The

11    Probation Officer's Report indicates that Petitioner had multiple prior convictions

12    including, possession of cocaine for sale, carrying a loaded firearm in a public

13    place, threatening with the intent to terrorize and domestic violence.  Exhibit 3

14    (Probation Officer's Report) at 3.  However, Petitioner's prior record alone

15    cannot support the upper terms for both the voluntary manslaughter and the

16    firearm enhancement because "[t]he same fact cannot be used to impose an upper

17    term on a base count and an upper term for an enhancement."  *People v.*

18    *Velasquez*, 152 Cal.App.4th 1503, 1516 n. 12 (2007) (citing *People v. Scott*, 9

19    Cal.4th 331, 350 (1994)).  Therefore, Petitioner's prior convictions can only be

20    considered as an aggravating factor for one of the upper term sentences, either the

21    voluntary manslaughter conviction, or the enhancement.  However, since the

22    "finding of a single aggravating factor is sufficient to render a defendant eligible

23    for the upper term" this court only needs to consider whether any of the

24    remaining aggravating factors found by the trial judge would have been found by

25    the jury and could have supported the upper term on the other conviction.  *See*

26    *Butler*, 528 F.3d at 632.

27            Petitioner's probationary status at the time of the offense was cited by the

28                                              24

trial judge as an aggravating factor for the voluntary manslaughter charge.[9]  RT at
304-16.  The San Francisco County Probation Officer's Report from Petitioner's
sentencing hearing states that Petitioner was sentenced to three years probation
for drug related charges in San Francisco County on February 3, 2000, just a little
over a month before the events that led to Petitioner's voluntary manslaughter
conviction.  Exhibit 3 (Probation Officer's Report) at 3.  The report also
concludes that Petitioner's commission of the offense occurred while he was on
probation, citing this as a valid circumstance in aggravation.  *Id.* at 9.  This
evidence establishes that the prosecution could have produced proof beyond a
reasonable doubt that Petitioner was on probation at the time of the offense "had
the question been properly put before the jury." *Salazar-Lopez*, 506 F.3d at 755.

   Petitioner's poor prior performance on probation was also an aggravating
factor that the judge relied on when imposing the upper term on Petitioner's
voluntary manslaughter sentence.[10]  Exhibit 1 (Sentencing Hearing) at 304-16.
While no evidence of Petitioner's prior performance on probation was presented
to the jury, "to determine whether an Apprendi error was harmless we must
examine the whole record, including the evidence presented by the government at
sentencing."  *Butler*, 528 F.3d at 651 (remanding habeas case for reconsideration
of *Blakely* claim in light of Probation Officer's Report).  The Probation Officer's
Report reflects that on February 3, 2000, Petitioner's was sentenced to a new
term of probation on drug charges when an earlier probationary term on a
domestic violence offense was simultaneously  terminated unsuccessfully.
Exhibit 3 (Probation Officer's Report) at 3.  The report also notes that "[a] review

---

[9]California Rules of Court 4.421(b)(4) lists the fact that "[t]he defendant was on
probation or parole when the crime was committed" as an aggravating factor.

[10]California Rules of Court 4.421(b)(5) lists "[t]he defendant's prior
performance on probation or parole [being] unsatisfactory" as an aggravating factor.

of the [Petitioner's] probation file reveals a serious history of domestic violence which continued while on grants of probation." Exhibit 3 (Probation Officer's Report) at 10. The summary and evaluation section of the report listed Petitioner's prior unsatisfactory performance on probation as a circumstance in aggravation. Exhibit 3 (Probation Officer's Report) at 9. The record shows facts which establish Petitioner's poor prior performance on probation. Had the jury been presented with these facts, it would have found one of these aggravating factor beyond a reasonable doubt.

This Court finds that the jury would have found at least one of the aggravating factors found by the judge beyond a reasonable doubt, and therefore any error was harmless under *Brecht*. Because this Court finds that any *Blakely/Apprendi/Cunningham* error in Petitioner's sentencing was harmless, Petitioner is not entitled to habeas relief on this claim.

## CONCLUSION

The state court's denial of Petitioner's habeas petition is not contrary to or an unreasonable application of established federal law as determined by the United States Supreme Court. Therefore, Petitioner's petition for writ of habeas corpus must be DENIED. The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: September 21, 2009

_____
JEFFREY S. WHITE
United States District Judge

1

UNITED STATES DISTRICT COURT

2

FOR THE

3

NORTHERN DISTRICT OF CALIFORNIA

4

5

STACY D LANGLEY,

6

                    Plaintiff,

Case Number: CV06-03254 JSW

7

    v.

**CERTIFICATE OF SERVICE**

8

THOMAS L CAREY, WARDEN et al,

9

                    Defendant.

10

———————————————————/

11

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District

12

Court, Northern District of California.

13

That on September 21, 2009, I SERVED a true and correct copy(ies) of the attached, by placing

14

said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by
depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office.

15

16

17

18

Stacey D. Langley
T-91228

19

2100 Peabody Road
Vacaville, CA 9569

20

Dated: September 21, 2009

21

*Jennifer Ottolini*

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk

22

23

24

25

26

27

28